**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA          :

    v.                                            :          **CRIMINAL NO. 11-579**

GEORGE ANTHONY TORRES, III          :

**GOVERNMENT'S SENTENCING MEMORANDUM AND
MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION FOR SPECIAL PROBATION PURSUANT TO
TITLE 18, UNITED STATES CODE, SECTION 3607**

In the year prior to the instant offense, the defendant, George Anthony Torres, III, was convicted of disorderly conduct for driving under the influence of marijuana and, two months later, of straw purchase of a firearm for an individual he knew to be a convicted felon. Thereafter he committed the instant offense by attempting to purchase fentanyl from an individual cooperating with the government – this offense was committed by the defendant while he was on probation for his straw purchase <u>and</u> while he was in the "Last Chance" program of The Boeing Company for drug-related work infractions. And yet here, he not only seeks to avoid any incarceration for his offense, but seeks special probation from the Court under Title 18, United States Code, Section 3607. Neither disposition is warranted. The defendant has shown complete disregard for the chances to become a law-abiding citizen already afforded him by local courts and for the opportunity to reform his behavior and return to a well-paying job at The Boeing Company's Ridley Park, PA facility. It is time for the defendant to be held accountable for his conduct, which can be accomplished by a sentence that reflects the seriousness of his offense, promotes respect for the law and provides a just punishment for his criminal conduct. Accordingly, the government respectfully requests that the Court impose a

sentence in the middle of the sentencing guideline range and impose a full term of supervised release thereafter.

## I.      BACKGROUND

On May 8, 2012, the defendant pled guilty to Count One of the information charging him with attempted possession of fentanyl, in violation of Title 21, United States Code, Section 846.  The charge stems from his attempt on September 9, 2011, to illegally purchase fentanyl Actiq 1200mcg lollipops from an individual cooperating with the government who he knew from his employment at The Boeing Company's Ridley Park facility.

## II.     SENTENCING CALCULATION

### a.      Statutory Maximum Sentence

According to the Probation Office, the Court may impose a sentence of one year imprisonment, one year of supervised release, a $100,000 fine, and a $25 special assessment.[1]

### B.      Sentencing Guidelines Calculation

The Probation Office correctly calculated the defendant's advisory guideline range as follows:

| | |
|---|---|
| Base offense level based on attempted possession of controlled substances, 21 U.S.C. § 844, under U.S.S.G. § 2D2.1: | **8** |
| Adjustment for acceptance of responsibility, under U.S.S.G. § 3E1.1(a)[2] | **- 2** |

**TOTAL OFFENSE LEVEL**                                                          **6**

---

[1]      The potential fine of $100,000 per count of conviction is different from the fine that the parties understood could be imposed at the time of the defendant's change of plea hearing – it was the parties understanding that the maximum fine that could be imposed was $1,000 per count of conviction.  The special assessment is also different in that it is $25 instead of $100.

[2]      As indicated above, the defendant attempts to deflect responsibility for his criminal actions in this case by blaming the government cooperator.  The government asks that this deflection be considered in determining the appropriate guideline sentence to be imposed.

The defendant has a Criminal History Category of **II** because he has a prior conviction for straw purchasing a firearm for a convicted felon and was on probation at the time of the instant offense.  PSR ¶¶ 30-32.   Accordingly, with a total offense level of 6 and a criminal history category of II, his guidelines range is **one to seven months imprisonment**.

## III.   DISCUSSION OF SECTION 3607

Although technically statutorily eligible for Section 3607 relief, such relief is completely unwarranted for this defendant.  The defendant began his employment at Boeing in 2009.  His employment history is summarized as follows:

> January 2009 to October 2009 - Sheet-Metal Assembler B
> October 2009 to July 2011 - Composite Fabricator
> July 2011 to 2012 - Sheet-Metal Assembler B

This defendant, like every other defendant in this matter, signed Boeing's Code of Conduct prohibiting him from violating all applicable laws, rules and regulations for the length of his tenure with the company.  He also agreed to inform the company if he was arrested or charged with any criminal offenses.

The defendant should be deemed ineligible for relief under section 3607 because he previously received opportunities from local courts to cease criminal conduct as follows:

- In January 2010, the defendant was arrested for driving a vehicle after using marijuana.  He was convicted of disorderly conduct and, on June 1, 2010, was ordered to pay fines and costs.

- In April 2010, while the above-listed charges were outstanding, the defendant straw purchased a firearm for a friend who he knew to be a convicted felon in exchange for money.  On August 30, 2010, he pled guilty and was sentenced to three years probation.  A violation hearing based on the instant offense is pending, and a $2,603 judgment filed by the Delaware County Adult Probation and Parole Department appears to be outstanding.

- In August 2011, the defendant was put into The Boeing Company's "Last Chance" program and given outpatient substance abuse treatment as part

of an opportunity for him to retain his employment with the company despite marijuana-related work infractions.

- Less than one month into the "Last Chance" program and a little over a year into his three-year term of probation, the defendant committed the instant offense by attempting to purchase two Actiq 1200mcg lollipops from an individual cooperating with the government and who the defendant knew from his work. During the attempted purchase, the defendant told the cooperator that if the cooperator didn't repay a loan owed to someone, Pagans would be sent to his house, which was appropriately perceived by the cooperator as a threat.

Although Title 18, United States Code, Section 3607 does not expressly exclude this defendant from relief, the government urges this Court to adopt the spirit and intent of the statute and deny relief to this defendant, who has already been given multiple chances by local courts and a chance by The Boeing Company to get any needed assistance and become a law-abiding citizen.

It is worth note that the defendant's disciplinary files from work show multiple violations of Boeing's standards of conduct for employees:

- On August 3, 2009, he received a written warning for traffic violations on the Boeing campus.

- On December 4, 2009, he received a written warning for "unsatisfactory attendance by failing to comply with site practice."

- On August 12, 2010, he was suspended without pay for one day for leaving "the company premises outside of [his] normal break and lunch time."

- On November 3, 2010, he received a written warning for performance-related issues.

- On May 7, 2011, he received a written warning for "unsatisfactory attendance by failing to comply with site practice."

- On May 19, 2011, he was suspended without pay for three days for performance-related issues.

In addition, the Probation Officer reports that since the defendant was removed from electronic monitoring, "his reporting habits have been poor."  PSR ¶ 5.

For these reasons, as well as the reasons stated below, the government respectfully requests that the Court deny the defendant's motion for Section 3607 relief and sentence him to the middle of the sentencing guideline range.

## IV.    DISCUSSION OF THE SENTENCING FACTORS

Once the Court has properly calculated the guideline range, the Court must next consider all of the sentencing considerations in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).[3]  In this case, the government believes that a sentence in the middle of the sentencing guideline range is warranted.

---

[3] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the 'not greater than necessary' language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'" United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006) (quoting United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006)).

A.     **Nature and Circumstances of the Offense and History and Characteristics of the Defendant.**

     I.     **Fentanyl**

"Fentanyl is 100 times more potent than morphine as an analgesic," and is extensively used for anesthesia and analgesia but is also used for chronic pain management.[4] Actiq, the type of fentanyl product at issue here, is a "solid formulation of fentanyl citrate on a stick that dissolves slowly in the mouth for transmucosal absorption.[5] "It is intended for opiate-tolerant individuals and is effective in treating breakthrough pain in cancer patients."[6]

"[Fentanyl] is similar to other opioids like morphine or oxycodone in its pharmacological effects and produces analgesia, sedation, respiratory depression, nausea, and vomiting.[7] It also appears to produce muscle rigidity with greater frequency than other opioids.[8] The biological effects are indistinguishable from those of heroin, with the exception that fentanyls may be hundreds of times more potent."[9]

Like oxycodone, fentanyl is classified as a schedule II substance and is abused for its intense euphoric effects.[10] "Fentanyl can serve as a direct substitute for heroin in opioid dependent individuals," but is a very dangerous substitute for heroin because it is much more

---

[4] http://www.deadiversion.usdoj.gov/drugs_concern/fentanyl.pdf; http://www.justice.gov/dea/concern/fentanyl.html

[5] http://www.justice.gov/dea/concern/fentanyl.html

[6] Id.

[7] Id.

[8] Id.

[9] Id.

[10] http://www.justice.gov/dea/concern/fentanyl.html

potent than heroin and results in frequent overdoses that can lead to respiratory depression and death."[11]

## II.      Prescription Drug Abuse is a Rampant National and Local Problem

Prescription drug abuse – despite (or maybe because of) popular misconceptions – is more wide-spread, more destructive, and more dangerous than even street-level drug abuse. Nearly seven million Americans are hooked on prescription drugs, more than are addicted to cocaine, heroin, hallucinogens, ecstasy, and inhalants – combined.[12]  Prescription drugs hook the poor and the rich, the old and the young, the black and the white.[13]  It is an epidemic.[14]  Just like street drugs, prescription drugs are dealt, hand-to-hand, just like baggies of heroin or vials of crack.[15]  And just like street drugs, prescription drug abuse produces the same problems: "addiction, crime and broken families."[16]

In recent years, courts around the country have begun to recognize the same. See, e.g., United States v. Marty, 450 F.3d 687, 690 n.4 (7th Cir. 2006) ("the danger that arises from

---

[11] Id.

[12] Prescription Drug Abuse Ravages Youth, MSNBC, July 6, 2009, available at http://www.nbcphiladelphia.com/news/health/Prescription_drug_abuse_ravages_state_s_youth.html.

[13] See also Kimberly Kindy, A Tangled Story of Addiction, Washington Post, Sept. 12, 2008, at A01, available at http://www.washingtonpost.com/wp-dyn/content/story/2008/09/11/ ST2008091103947.html (describing Cindy McCain's addiction to Percocet, and her doctor who supplied her with the drugs lost his license).

[14] Prescription Drug Abuse Called "Epidemic", UPI, July 8, 2005, available at http://www.upi.com/Science_News/2005/07/08/Prescription_drug_abuse_called_epidemic/UPI-13411120831997/; National Drug Intelligence Center, National Drug Threat Assessment 2005, U.S. Department of Justice, Document ID: 2005-Q0317-003, February 2005 at 99.

[15] Good Medicine Meets Bad Behavior, CNN, available at http://www.cnn.com/ 2006/HEALTH/05/16/cnna.passierb/index.html.

[16] Michael Janofsky, Drug-Fighters Turn to Rising Tide of Prescription Abuse, N.Y. Times, March 18, 2004, at A24.

the sale, misuse, and abuse of OxyContin is not excused by its status as a prescription painkiller. While Marty may have obtained her pills from a pharmacy, rather than a drug dealer, her crime still poses a grave danger to the community."). In United States v. Purdue Frederick Co., Inc., a court noted:

> Prescription drug abuse is rampant in all areas of our country . . . causing untold misery and harm. The White House drug policy office estimates that such abuse rose seventeen percent from 2001 to 2005. That office reports that currently there are more new abusers of prescription drugs than new users of any illicit drugs. As recently reported, "Young people mistakenly believe prescription drugs are safer than street drugs . . . but accidental prescription drug deaths are rising and students who abuse pills are more likely to drive fast, binge-drink and engage in other dangerous behaviors."

495 F.Supp.2d 569, 576 (W.D. Va. 2007); see also McCaulley v. Purdue Pharma, L.P., 2002 WL 398715, at *1 (W.D. Va. 2002) (not precedential) (referring to the "national problem of prescription drug abuse").

In the Eastern District of Pennsylvania, prescription drug abuse is quite significant as well.[17]  Local clinics have stated that "drug addiction in both Philadelphia and New Jersey is almost legendary due to its severity.  Heroin and opioid-based prescription medication are two the top drugs abused in these areas.  More than four percent of those surveyed in both the Philadelphia area and in New Jersey reported using pain relievers for nonmedical purposes in the past year . . . The rural areas of Pennsylvania, too, are increasingly becoming a target of drug dealers."[18]  State legislators in Pennsylvania have been trying to address this growing problem.[19]

---

[17] National Drug Intelligence Center, Philadelphia/Camden High Intensity Drug Trafficking Area Drug Market Analysis, June 2007, available at http://www.justice.gov/ndic/pubs23/23921/abuse.htm.

[18] See http://www.meditoxofpalmbeach.com/philadelphia-new-jersey-opiate-detox.html.

[19] Rafferty Bill Would Crack Down On Prescription Drug Abuse, Fraud, Senate Republican Communications, May 3, 2004, available at http://www.pasenategop.com/news/archived/2004/0504/rafferty-050304-prescrip.htm ("Rafferty noted that prescription drug fraud and abuse are becoming a serious problem in Pennsylvania and other states, and stricter

Part of the reason that prescription drug abuse is so rampant is because they come with the imprimatur of legitimacy: Doctors hand them out; it is not per se illegal to have them. There is very low social disapproval.[20]  The general public – which the Court takes into consideration at the time of sentencing when considering the nature of the defendant's conduct – is grossly misinformed about the danger of prescription drug abuse.  According to a recent poll:

- 40 percent say prescription pills are "much safer" than illegal drugs.

- 31 percent say there is "nothing wrong" with prescription drug use.

- 29 percent think prescription painkillers are non-addictive.[21]

In fact, prescription drugs contain opioids that are just as dangerous as those contained in cocaine and heroin.[22]  This low social disapproval is partly responsible for encouraging continued prescription drug abuse, especially among the young.[23]

---

guidelines need to be in place to combat the problem. He said prescription drug abuse accounts for approximately one-third of all drug abuse in the United States.").

[20] See Jason Szep, Grappling With Prescription Drug Addiction, Reuters, July 30, 2008, available at http://features.us.reuters.com/wellbeing/news/S3020463.html.

[21] Good Medicine Meets Bad Behavior, CNN, available at http://www.cnn.com/2006/HEALTH/05/16/cnna.passierb/index.html.

[22] Will Dunham, Study Sees Prescription Drug Abuse at US Colleges, Reuters, Mar. 3, 2008, available at http://www.reuters.com/article/latestCrisis/idUSN03357573.

[23] White House Press Release, Jan. 24, 2008, available at http://www.whitehousedrugpolicy.gov/news/press08/012408.html; see also Prescription Abuse Outstrips Illegal Drug Use, UN Warns, The Guardian, Mar. 1, 2007, available at http://www.guardian.co.uk/society/2007/mar/01/ drugsandalcohol.drugs.

In short, the prescription drug problem continues to grow because our society keeps underestimating its seriousness.[24]  It is a "significant threat" in the United States.[25] Combating prescription drugs drains law enforcement resources because "[d]rug diversion investigations can be complex and take many months."[26]  The investigation here took four years and a large amount of resources – the federal government simply does not have the resources to investigate every individual user at The Boeing Company's Ridley Park facility or to conduct similar investigations at every facility that manufactures sensitive equipment or vehicles.

### III.   Prescription Drug Abuse by Workers at The Boeing Campus's Ridley Park Facility Poses a Specific and Significant Threat to Society

The defendant in this and the 36 other cases arising out of the purchase and sale of prescription drugs at The Boeing Company's Ridley Park facility is a skilled worker whose employment at The Boeing Company provided him with the opportunity to be in the upper echelon of salary earners in the country: Internal Revenue Service's 2010 database indicates that the top 10% of Americans earn $113,799 per year; the top 25% earn $67,280 per year; and the top 50% earn $33,048.[27]  Here, the defendants salary at the time of his arrest was nearly $40,000 including overtime pay, and he had only just started his tenure at Boeing.  And unlike junkies and drug dealers on the street, the defendant had options.  The Boeing Company's medical

---

[24] See, e.g., Fredrick Kunkle, Attorney General Targets Prescription Drug Abuse, Washington Post, Oct. 6, 2005, at T03, available at http://www.washingtonpost.com/ wp-dyn/content/article/2005/10/05/AR2005100500007.html (state attorney general noting that "abuse of prescription drugs has gone unnoticed").

[25] National Drug Intelligence Center, National Drug Threat Assessment 2005, U.S. Department of Justice, Document ID: 2005-Q0317-003, February 2005 at 99.

[26] Tim Reiterman, Prescriptions Supplanting Illegal Substances as Drugs of Choice, L.A. Times, May 18, 2008, available at http://www.latimes.com/news/ custom/scimedemail/la-me-drugs18-2008may18,0,6739996.story.

[27] http://www.financialsamurai.com/2011/04/12/how-much-money-do-the-top-income-earners-make-percent/

coverage includes drug treatment and counseling, and the company's Employee Assistance program offered them confidential access to drug counselors and inpatient and outpatient drug treatment.

Furthermore, although the defendant was suspended at the time of his criminal conduct in this case, the goal of the suspension was to allow him to return to Boeing as a sheet-metal assembler on The Boeing Company's production of the V-22 Osprey.  The V-22 Osprey is the first aircraft designed from the ground up to meet the needs of the Defense Department's four U.S. armed services: it "can transport 24 combat troops, 20,000 pounds of internal or up to 15,000 pounds of external cargo using its medium lift and vertical takeoff and landing capabilities; meets U.S. Navy requirements for combat search and rescue, fleet logistics support, and special warfare support; matches the U.S. Special Operations Command's requirement for a high-speed, long-range, vertical lift aircraft; can be stored aboard an aircraft carrier or assault ship because the rotors can fold and the wings rotate; [and] has air-to-air refueling capability, the cornerstone of the ability to self-deploy."[28]  As a result, "more than 165 Osprey tiltrotors are currently in operation across 10 Marine Corps and two Air Force Special Operations Command Osprey squadrons.  The two services have together logged 16 successful combat, humanitarian, ship-based or Special Operations deployments since 2007.  The worldwide Osprey fleet has amassed more than 135,000 flight hours, with nearly half of those hours logged in the past two years."[29]

The consequences of any undetected errors made in by the defendant during the course of his employment cannot be understated.  Aside from the fact that the defendant was involved in the maintenance of large, heavy machinery, any errors that affected the performance

---

[28] http://www.boeing.com/rotorcraft/military/v22/

[29] http://www.boeing.com/rotorcraft/military/v22/docs/V-22_overview.pdf

of completed V-22 Osprey could prove disastrous: possible injury or death to the crew using the particular aircraft plus complete grounding of the entire fleet.  In fact, the United States military has also grounded its V-22 Osprey fleet when accidents have happened.   For example, the United States Marine Corps grounded its fleet of V-22 Osprey in February 2007 after discovering a glitch in a computer chip that could cause the aircraft to lose control; and grounded its fleet of V-22 Osprey in 2000 after two fatal crashes that killed 23 Marines.[30]

## IV.   Analysis of the Defendant's Background

As stated above, the defendant began his employment at Boeing in 2009 and worked as a sheet-metal assembler and composite fabricator.  He signed Boeing's Code of Conduct prohibiting him from violating all applicable laws, rules and regulations for the length of his tenure with the company.  During his tenure at Boeing, he was given two different chances by state courts to refrain from criminal activity as well as a chance from Boeing to get treatment and retain his employment, and yet he continued to commit crimes during those chances.  His overlapping criminal activity includes driving while using marijuana, straw purchasing a firearm for a convicted felon while the driving charges remained outstanding, and the instant offense, which took place while the defendant was on probation and owed fines and costs for the straw purchase.  Prior to his being placed on Boeing's "Last Chance" program, he also had six disciplinary actions taken against him for breaches of Boeing's standards of conduct for employees, including two separate suspensions without pay.  During the transaction underlying the current charge, he relayed a threat to the government cooperator, and his recent reporting habits to Pretrial Services have been poor.  Despite his important role in the manufacture of the V-22 Osprey and his history of criminal convictions and work-related disciplinary issues, in September 2011, the defendant sought to purchase the extremely strong opioid fentanyl from a

---

[30] http://www.washingtonpost.com/wp-dyn/content/article/2007/02/09/AR2007020901860.html

government cooperator.  Certainly, the nature and circumstances of the offenses committed and the history and characteristics of the defendant counsel in favor of a guideline sentence.

**B.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

The sentence imposed in this case must fairly punish the defendant for his criminal conduct, and reflect the seriousness of the offense.  Of the Boeing defendants charged with misdemeanors, this defendant is one of the few that has previously been given so many recent chances by courts and Boeing to refrain from continued criminal conduct.  Given that he was on Boeing's "Last Chance" program and had been given drug treatment about a month before he committed the instant crime, the defendant should have been personally aware of the potential consequences both to his job and to his life of continued criminal conduct.

The government respectfully submits that to sentence this defendant to probation or even to the low end of the advisory guideline range would not reflect the seriousness of his offenses, would undercut respect for the law by those with whom he worked, and would not provide a just punishment for his offenses.

**C.      The Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant**

When passing the Sentencing Reform Act, Congress explained:

[It is our] view that in the past there have been many cases, particularly in instances of major white collar crime, in which probation has been granted because the offender required little or nothing in the way of institutionalized rehabilitative measures . . . and because society required no insulation from the offender, without due consideration being given to the fact that the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance. The placing on probation of [a criminal] may be perfectly appropriate in cases in which, under all the circumstances, only the rehabilitative needs of the offender are pertinent; such a sentence may be grossly inappropriate, however, in cases in which

the circumstances mandate the sentence's carrying substantial deterrent or punitive
impact.

S. Rep. No. 98-225, at 91-92 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3274-75.

Prescription drug abuse is a "significant threat" in the United States.[31]  The
investigation here took a large amount of government resources and, because of the nature of the
plant under investigation and the closed culture of its employees, took many years.  Accordingly,
a sentence within the guidelines is necessary to afford both specific and general deterrence to
criminal conduct.   The recommended sentence of incarceration affords adequate deterrence to
others who would commit a similar offense, and protects the public from further crimes of the
defendant, for at least as long as he remains incarcerated.  The general deterrent effect of a
prison sentence is an appropriate consideration in choosing a reasonable sentence.  As the courts
of appeals have held both before and after Booker, deterrence under Section 3553(a) is not
limited to deterrence of the particular defendant. See, e.g., United States v. Eura, 440 F.3d 625,
638 (4th Cir. 2006) (concurring opinion) (referring to the court's consideration of "the general
deterrence factor, § 3553(a)(2)(B)"); United States v. Jordan, 435 F.3d 693, 698 (7th Cir. 2006)
(describing how Section 3553(a) "specifies that the court may consider the need for general
deterrence and respect for the law"); United States v. Glover, 431 F.3d 744, 751 (11th Cir. 2005)
(noting that pre-Booker and post-Booker, "the underlying goals of the statute and the Guidelines
are retribution, general deterrence, incapacitation, and rehabilitation" (internal quotation marks
omitted)); see also United States v. Yeaman, 248 F.3d 223, 232 (3d Cir. 2001) (referring to
Section 3553(a)'s goals of "general deterrence, specific deterrence, retribution, and
rehabilitation").  A sentence in the middle of the sentencing guidelines would help accomplish
this goal.

---

[31]     National Drug Intelligence Center, National Drug Threat Assessment 2005, U.S.
Department of Justice, Document ID: 2005-Q0317-003, February 2005 at 99.

**D.** **The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

There is no need in this case to adjust the sentence "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . ." Section 3553(a)(2)(D).

**E.** **The Guidelines and Policy Statements Issued by the Sentencing Commission**

As stated earlier, the Guidelines retain their significant importance in advising judges about appropriate sentences. Uniformity in sentencing should be a paramount goal; in order to rid the criminal justice system of unpredictability and possible bias, like offenders should receive like sentences, to the extent possible. The only vehicle for achieving such a goal is through the application of the Sentencing Guidelines. Here, the defendant's conduct warrants a guideline sentence and, the government submits, a sentence in the middle of the guidelines.

**F.** **The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

A guidelines sentence is necessary when considering the importance of avoiding unwarranted sentencing disparities, another factor that is set forth in Section 3553(a). As an initial matter, this Section 3553(a) factor is not primarily concerned with sentencing disparities in a particular case; it is designed to ensure sentencing consistency among similarly situated defendants across the entire nation. See United States v. Parker, 462 F.3d 273 (3d Cir. 2006); United States v. Carson, 560 F.3d 566, 586 (6th Cir. 2009) ("Although it is true that § 3553(a)(6) requires a sentencing judge to consider 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,'" that "factor 'concerns national disparities between defendants with similar criminal histories convicted of similar criminal conduct – not disparities between co-defendants.'").

      **G.**     <u>**The Need to Provide Restitution to Any Victims of the Offense**</u>

      Restitution is not an issue in this case.

**IV.**    **CONCLUSION**

      For all of the reasons stated above, the government respectfully recommends a sentence in the middle of the sentencing guidelines range of one to seven months imprisonment. This sentence is necessary to address the serious nature of the offense and the defendant's undeterred criminal conduct.

      Respectfully submitted,

      ZANE DAVID MEMEGER
      United States Attorney


      _____/s/_____
      FAITHE MOORE TAYLOR
      ASHLEY K. LUNKENHEIMER
      Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I certify that a copy of the GOVERNMENT'S SENTENCING MEMORANDUM has been filed electronically on the Electronic Case Filing system and is available for viewing and downloading from the ECF system, and/or was served by electronic mail on the following defense counsel:

Stephen D. Molineux, Esq.
Counsel for George Anthony Torres, III

_____/s/_____
Ashley K. Lunkenheimer
Assistant U.S. Attorney

Date:  October 2, 2012